IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| **QUALITY LEASE AND RENTAL HOLDINGS, LLC** | § § § § | CASE NO. 14-60074- 11 |
| **QUALITY LEASE RENTAL SERVICE, LLC** | § § § | CASE NO. 14-60075- 11 |
| **QUALITY LEASE SERVICE, LLC** | § § § | CASE NO. 14-60076 - 11 |
| **ROCACEIA, LLC** | § § § | CASE NO. 14-60077- 11<br>(Chapter 11) |
| DEBTORS. | § § § | Joint Administration Requested<br>Under Case No. 14-60074- 11<br>Judge David R. Jones |

**EMERGENCY MOTION FOR AUTHORITY TO USE
CASH COLLATERAL UNDER 11 U.S.C. §363, AND §105**
**************************************************************************
**\*\*AN EMERGENCY HEARING ON THIS MATTER WILL BE CONDUCTED ON TUESDAY, OCTOBER 7, 2014 AT 9:30 A.M. IN COURTROOM 400, 4TH FLOOR, 515 RUSK, HOUSTON, TEXAS, 77002.\*\***

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

EMERGENCY CONSIDERATION OF THIS MOTION HAS BEEN GRANTED.  BECAUSE THE COURT WILL CONSIDER THE MOTION ON AN EMERGENCY BASIS, YOU WILL HAVE LESS THAN 14 DAYS TO ANSWER.  IF YOU OBJECT TO

**THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED; YOU SHOULD FILE AN IMMEDIATE RESPONSE**.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Quality Lease and Rental Holdings, LLC ("QLRH"), Quality Lease Rental Service, LLC ("QLRS"), Quality Lease Service, LLC ("QLS"), and Rocaceia, LLC ("Rocaceia") (collectively "Quality" or "Debtors"), file this *Emergency Motion for Order Granting Authority to Use Cash Collateral Under 11 U.S.C. §363, and §105* (the "Motion") and in support thereof, respectfully states as follows:

## SUMMARY AND EMERGENCY BASIS

1. These Chapter 11 cases were each filed on October 1, 2014. By this Motion, Debtors seek authority to use Cash Collateral in order to fund operations while they formulate a Chapter 11 plan. Cash collateral consists of cash and accounts receivable generated by the Debtors in connection with the operations described below.

2. Upon approval of this Motion, Main Street Capital Corporation, as agent for lenders, Main Street Equity Interests, Inc. and MSCII Equity Interests, LLC (collectively "Main Street Lenders"), which hold first liens on the Debtors' assets, will be granted replacement liens and security interests on all assets of Debtors and their respective estates, whether now existing or hereafter acquired, and the proceeds, income and profits and offspring of any of the foregoing, to secure the Debtors' use of Cash Collateral, whether pursuant to this Agreed Order or otherwise, and to secure any diminution in value of the Collateral. Such replacement liens and security interests (i) are subordinate only to any prior existing and validly perfected liens and security interest in such assets, and (ii) shall attach in the same order of priority that existed as to

the Collateral under applicable non-bankruptcy law as of the Petition Date and to the extent that Cash Collateral is used.

3. Debtors have moved this Court on an emergency basis for authorization to use cash collateral in order to satisfy the ordinary and necessary expenses of operation. An emergency hearing is necessary since some of these expenses need to be paid before expiration of the fourteen (14) day notice period provided for in Bankruptcy Rule 4001 and for use of cash collateral. Debtors also request the Court authorize the Debtors' use of cash collateral on both a preliminary basis, and on a final basis if no objection to this relief is received prior to the 15th day after the entry of the order approving the same.

## I. JURISDICTION AND VENUE

4. This Court has jurisdiction over these cases pursuant to 28 U.S.C. § § 157, 1334.

5. This is a core proceeding under 28 U.S.C. § 157(b)(2)(D).

6. Venue of the Debtors' Chapter 11 cases is proper in this district pursuant to 28 U.S.C. §§ 1409.

## II. FACTUAL BACKGROUND

### A. Overview

7. The above captioned bankruptcy cases were each filed on October 1, 2014 (collectively "Petition Date") under chapter 11 of title 11 of the Bankruptcy Code, 11 U.S.C. §§101 *et seq*. (the "Bankruptcy Code"). The Debtors continue to manage their property as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

8. A Motion seeking joint administration of these cases was filed on October 2, 2014 (Docket #3) and remains pending before the Court.

9. No trustee or examiner has been appointed in the Debtors' bankruptcy cases and no official committee of unsecured creditors has been established.

10. The Debtors are related, privately-owned oil field services companies operating primarily in Victoria, Texas, that provide energy companies throughout Texas with drill site services and equipment rentals.

11. Quality Lease Service, LLC ("QLS") was originally founded in 1989 and converted to a Texas limited liability company on or about December 27, 2012.  Quality Lease Rental Service, LLC ("QLRS") is Texas Limited Liability Company formed on February 8, 2008.  Both entities operate as subsidiaries of Quality Lease and Rental Holdings, LLC ("QLRH"), which is a Delaware limited liability company formed on December 4, 2012 and duly authorized to transact business in the State of Texas as of January 8, 2013.  Rocaceia, LLC ("Rocaceia") is the parent company and is a Delaware Limited Liability Company formed on November 7, 2012 duly authorized to transact business in the State of Texas as of January 8, 2013.  QLRH is majority owned by Rocaceia.

12. Debtors' operations are primarily conducted through QLRS and QLS.  The Debtors provide full service operations to the oil field industry including, turn-key, high quality, custom built mobile housing units to be used at the well site during drilling and completion operations.  The Debtors offer oilfield equipment rental services, including rig houses, frac tanks, light towers, generators, compressors, trash containers, water and sewer systems, and pumps; and production services, including vacuum trucks, pump trucks, winch trucks, frac tanks, mud tanks, fluid transportation, fluid pumping and fluid disposal. The Debtors rig houses are the most stable and solid in the industry and are desired due to their high end interior finish and an insulation package that makes the interior living area much quieter than the competition.  The Debtor also

has a well trained staff of service technicians who are able to service any problems related to the leased equipment whether it be a generator, water delivery system, television, or "gray water". The service personnel are on call 24 x7 and may need to respond at odd hours to locations well off any main or secondary road. The objective of the Debtor is to make living in a hostile and remote location as comfortable and convenient as possible for their served customers' employees.

13. The Debtors currently have 31 fulltime hourly employees and 9 salaried employees. Of the hourly personnel, 10 are commercial drivers; 7 are service technicians; 3 are roustabouts; 3 perform administrative functions and 8 perform specialized mechanical and maintenance functions on both vehicles and the rig houses and their ancillary equipment such as generators and water and sewer skids.

14. The employment market is extremely competitive in the Eagle Ford shale area of South Texas served by these entities. Hourly wages are high and overtime abounds, particularly for drivers. Given the remote locations of the rigs serviced and small towns in the served areas, it is difficult to recruit and retain quality employees.

15. Of the 9 salaried personnel, 1 is the President; 3 are sales personnel; 3 are operations supervisors; 1 is the safety manager and 1 oversees maintenance. The President is a certified turnaround professional with over 20 years of experience in turnaround situations. All other salaried employees have extensive experience in the market serviced.

**B. History**

16. Until December 2012, QLS and QLRS were owned and operated by David Michael Mobley ("Mobley") and Greta Mobley (together the "Mobley Sellers"), as oilfield service companies. On December 31, 2012, QLRH, which is owned primarily by Rocaceia,

entered into a Purchase and Contribution Agreement (the "Purchase Agreement") by which it agreed to obtain all the stock of QLS and QLRS from the Mobley Sellers in exchange for approximately $60 million ("Transaction"). As of January 8, 2013, Rocaceia was owned by Allan S. Martin and Marie B. Martin, Atlantic Merchant Capital Investors, LLC, TSF Holdings, LLLP, S. Jim Farha Living Trust, Fleur De Lis Partners, LLLP, The Nancy Linden Rowden Revocable Trust, Andy Krusen, MSCII Equity Interests, LLC, and Main Street Equity Interests, Inc. and Rocaceia owned 80% of QLRH, with the Mobley Sellers retaining 20% ownership of QLRH as part of the Transaction As further discussed below, Main Street Lenders provided QLRH approximately $40 million to fund the Transaction[1]. The Mobley Sellers retained an unsecured subordinated note ("Mobley Subordinated Note") for the $20 million balance of the purchase price[2] and as discussed above, minority interest in QLRH. Mobley also executed an employment agreement ("Employment Agreement") whereby QLRH agreed to employ Mobley as its President. The Employment Agreement contained a three year non-compete from the date Mobley's employment terminated.

17. In April 2013, QLRH placed Mobley on administrative leave pending an investigation into alleged breaches of his Employment Agreement and fiduciary duty to QLRH by, among other things, diverting QLRH business to other companies affiliated with Mobley.

---

[1] QLRH, QLS, and QLRS are all obligors on the debt to Main Street Lenders. Rocaceia is a guarantor of this debt. Main Street Capital Corporation ("MSCC") and Main Street Capital II, LP ("MSCII") are the original Main Street Lenders. Subsequently, MSCC and MSCII transferred their interest in this debtor to its subsidiaries Main Street Equity Interests, Inc. ("MSEI") and MSCII Equity Interests, LLC ("MSCIIEI), who remain the current lenders on the debt.

2 On December 31, 2012, QLRH and Mobley executed that certain Unsecured and Subordinated Promissory Note, made payable to in the original principal amount of $20,000,000. On January 8, 2013, as an inducement for Main Street Lenders to fund the Transaction, Mobley, the Debtors and Main Street Lenders entered into a Subordination and Intercreditor Agreement whereby the Mobley Subordinated Note is subordinated to the debt owed to Main Street Lenders. The full balance of the Mobley Subordinated Note is outstanding and disputed as part of the State Court Litigation.

18. Subsequently, QLRH filed suit against Mobley in the United States District Court for the Middle District of Florida, alleging breach of the Employment Agreement, breach of fiduciary duty, and fraud in connection with the Employment Agreement ("Florida Litigation"). QLRH also alleged that Mobley made a number of false statements in connection with the sale of QLS and QLRS, including material misrepresentations regarding the revenue and earnings of the QLRH purchased entities. On April 10, 2013, the Mobley Sellers initiated suit under Cause No. 46,632, styled as *Greta Yvette Mobley, et al. v. Quality Lease and Rental Holdings, LLC and Allan Martin*; in the 329th Judicial District Court of Wharton County, Texas ("State Court Litigation"), asserting claims of conversion and invasion of privacy against QLRH. QLRH dismissed the Florida Litigation and asserted causes of action based on the Employment Agreement as counterclaims against Mobley in the State Court Litigation, including breach of contract and breach of fiduciary duty. QLRH also sought equitable relief based on allegations of fraud in connection with both the Purchase Agreement and Employment Agreement, including allegations of misrepresentation in connection with the sale of QLS and QLRS, regarding their revenue and earnings. Recently, QLRH has asserted a federal securities law claim in the State Court Litigation. This matter remains pending.

19. Subsequent to the initiation of the State Court Litigation in February 2014, ownership of Rocaceia was transferred to CWC Operations, Inc., a Texas corporation owned by Chris Williams, a highly regarded turnaround and restructuring manager. Mr. Williams is currently the President and manager of each of the Debtors.

### C. Reason for Bankruptcy Filing

20. Since the Transaction, QLS and QLRS, the operating subsidiaries, have failed to ever achieve revenues and levels of profitability projected by the Mobley Sellers. For 2014, the

Debtors have collective sales of approximately $6.2 million though the end of August. Monthly sales average between $780,000 - $858,000.

21. Cash flow has been sufficient to cover operational expenses but insufficient to cover legal expenses, interest expenses associated with financing of the Purchase Agreement, and other non-operational expenses. The companies are unable to meet required debt service to its senior secured lender and have defaulted in their obligations. The damages caused by Mobley, discussed above, and the stigma associated with the State Court Litigation, along with the astronomical legal fees and expenses associated with the lawsuit are the primary reasons for these bankruptcy filings.

22. The Debtors collectively own assets in excess of $12 million including approximately $150,000 in cash, approximately $1.5 million in outstanding A/R, plus approximately $200,000 in older A/R which has not been collected, $10.5 million in FFE valued "in place", and $350,000 in real estate holdings. Additionally, the Debtors hold contingent litigation claims, primarily against Mobley and the Mobley Sellers which may yield significant value. The Debtors also collectively have debt in excess of $61 million, which includes secured debt of approximately $37.4 million (principal balance), plus accrued interest, expenses and fees owed to Main Street Lenders, approximately $140,000 to various lenders with respect to secured vehicle loans, $3 million in unsecured debt, originally owed to the former principal of Rocaceia and which was subsequently transferred to CWC Operations Inc., unsecured disputed debt on the Mobley Subordinated Note of $20.0 million, $375,000 in disputed accounts payable, and approximately $40,000 in current vendor debt.

23. The goal of these Chapter 11 cases is to sell QLS and QLRS through a bidding process, with the proceeds utilized to fund a Chapter 11 plan which will provide a return to the creditors in these cases.

**D. Financing History**

Main Street Lenders Debt

24. On or about January 8, 2013, QLRH, QLS and QLRS (collectively "Borrowers") entered into entered into a Loan Agreement, Note, Security Agreement, Pledge Agreement and related loan documents with Main Street Lenders which provided, among other things, that Main Street Capital Corporation ("MSCC") and Main Street Capital II, LP, ("MSCII"), make senior secured term loans from time to time to Borrowers in an aggregate amount not to exceed $45,000,000, including an initial term loan, on the Closing Date, in an amount of approximately $37,350,000 in order to partially fund the Transaction (the "Main Street Capital Loan #1").  MSCC funded 90% of the Main Street Capital Loan #1 and MSCII funded the remaining 10%. Subsequently, MSCC transferred its 90% in Main Street Capital Loan #1 to Main Street Equity Interests, Inc. ("MSEI") and MSCII transferred its 10% to MSCII Equity Interests, LLC ("MSCIIEI").  Rocaceia is a guarantor of the Main Street Capital Loan #1.  As stated above, Main Street lender also retained a minority equity interest in Rocaceita.

25. The Main Street Capital Loan#1 is secured by liens on substantially all the assets of the QLRH, QLS and QLRS.  $37,350,000 in loan proceeds were fully funded by MSCC and MSCII at the closing of the Transaction.  As of the Petition Date, the outstanding principal balance on the Main Street Capital Loan #1 was $37,350,000, plus interest, costs, expenses and attorneys' fees.

26.  The Debtors have defaulted on the Main Street Capital Loan #1.  Prior to the bankruptcy filing, Main Street Lenders and the Debtors entered into various forbearance agreements, all of which have now expired.

27.  Additionally, on July 1, 2014, QLRS entered into a Revolving Credit Note with MSCC, as Agent for MSEI and MSCIIEI in the amount of $1.5 million ("Main Street Capital Loan #2").  The maturity date of the Main Street Capital Loan #2 is October 1, 2014.  Approximately $330,050, plus accrued interest, fees and expenses is outstanding with respect to this note. Main Street Capital Loan #1 and Main Street Capital Loan #2 are collectively "Main Street Capital Loans".

### III. BASIS FOR REQUESTED RELIEF

**A.  Cash Collateral and Authority to Use**

28.  As stated above, prior to the Petition Date, the Debtors entered into the loan documents with Main Street Lenders, whereby the Debtors granted Main Street Lenders a first lien and security interest in substantially all of its assets, including accounts receivable and cash (collectively "Collateral").

29.  Main Street Lenders are currently owed in excess of $38 million (principal balance), plus interest, expenses, and fees with respect to the Main Street Capital Loans. While the terms of an agreed order have not been finalized, Main Street Lenders have agreed to the Debtors' use of cash collateral and the Debtors expect that an agreed order will include, among others, the following:

>   A.  Debtors may use cash collateral pursuant to approved budgets attached as Exhibit "A" and "B", with a 10% variance per line item and the ability to apply any un-used budgeted funds at its discretion.
>
>   B.  The Debtors shall adequately protect Main Street Lender's prepetition liens by granting Main Street Lenders replacement liens and

security interests on all assets of Debtors and their estates, whether now existing or hereafter acquired, and the proceeds, income and profits and offspring of any of the foregoing, to secure the Debtors' use of Cash Collateral, whether pursuant to this Agreed Order or otherwise, and to secure any diminution in value of the Collateral.  Such replacement liens and security interests (i) are subordinate only to any prior existing and validly perfected liens and security interest in such assets, and (ii) shall attach in the same order of priority that existed as to the Collateral under applicable non-bankruptcy law as of the Petition Date.

30. The only viable source of funding for post-petition operations is cash collateral made available to the Debtors.

31. The importance in cases like these of access to cash was recognized in *In re George Ruggieri Chrysler-Plymouth, Inc*., 727 F.2d 1017 (11th Cir. 1984). The court in that case noted: "A debtor, attempting to reorganize in business under Chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild." *Id*. at 1019. 31.  The Debtors anticipate that the Main Street Lenders will consent to the proposed use of cash collateral, subject to receiving replacement liens and perhaps other protections as provided in an agreed order.  To the extent it does not consent, however, the Court may authorize the use of cash collateral by the Debtors provided that the Court determines that any objecting entity's interest is adequately protected. 11 U.S.C. § 363(c)(2)(B) and (e).

32. Section 361 sets forth three non-exclusive examples of what may constitute adequate protection.  They include providing the secured creditor with "additional or replacement liens" and other relief that provides the secured creditor with the "indubitable equivalent" of the secured creditor's interest in the cash collateral.  Legislative history indicates that Congress intended to provide courts with flexibility to grant relief on a case-by-case basis.

33. Pursuant to the Motion, the Debtors propose to grant the secured creditor replacement liens on post-petition accounts receivable, a recognized method for providing adequate protection as specified under sections 361 and 363.

34. The Debtors anticipate receipt of revenue by the end of October and will need to utilize this income to pay ongoing expenses. Without access to cash collateral, operations will cease. The "going concern" value of the Debtors' assets will plummet, receivable collections will dry up and key employees will quit. From that standpoint, the overall collateral position of secured creditors will deteriorate markedly, more than offsetting any erosion of the cash collateral.

35. The Debtors request that the Court authorize the Debtors' use cash collateral to pay the expenses shown on the budgets attached hereto as Exhibits "A" and "B", with up to a 10% total variance on budgeted amounts, for 14 days and 90 days thereafter, respectively, from the entry of an order approving the same ("Order"). Bankruptcy Rule 4001(b)(2) states that 14 days' notice must be given before final approval of such cash collateral use is given. Accordingly, the Debtors further request that said Order shall become a final order on the 15th day after it is entered; provided that, if an objection to the Order ("Objection") is filed prior to the 15th day after its entry, the Order shall become final only after a hearing on the Objection. In the event the Objection is sustained, the terms and conditions and the respective rights and obligations of the parties set forth herein shall nevertheless remain binding, valid and in full force and effect for the period prior to entry of a court order sustaining such objection prior to the 15th day after entry of such Order.

36. If any party files an Objection to the use of cash collateral, then the Debtors' right to use cash collateral shall terminate at midnight on the 14th day after entry of the Order unless

(i) the Court orders otherwise, or (ii) Main Street Lenders consent to the use of cash collateral without obtaining the protections of the Order.

## IV. **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court:

1) Set an emergency hearing on this Motion;

2) Enter a preliminary order authorizing the use of cash collateral pursuant to the attached budget (Exhibit "A") for 14 days;

3) Absent objection to the use of Debtors' cash collateral, approve entry of a final order authorizing the use of cash collateral pursuant to the attached extended budget (Exhibit "B") through December 31, 2014, unless otherwise further extended by written agreement of Main Street Lenders and the Debtors; and

4) Granting all such other and further relief as is just and proper.

DATED:  October 2, 2014

Respectfully submitted,

HAWASH MEADE GASTON NEESE & CICACK LLP

By: */s/ Walter Cicack*
WALTER CICACK
Texas State Bar No. 04250535
2118 Smith Street,
Houston, Texas 77002
Telephone: 713. 658.9001
Facsimile: 713.658.9011

PROPOSED COUNSEL FOR DEBTORS

## **VERIFICATION**

The factual statements in paragraphs 1-3 are true and correct within my own personal knowledge. In my opinion, a genuine emergency exists that requires consideration of this matter in order to avoid hardship to the bankruptcy estate, and so that the Debtors can maintain its operations and control of its assets. I certify under penalty of perjury that the foregoing is true and correct.

*/s/ Walter Cicack*
WALTER CICACK

# Exhibit A

| Cash Flow, Rocaceia | October 1 - 15 | |
|---|---|---|
| | **Exhibit A** | |
| | Plan | Plan |
| **Total Estimated Billings** | | |
| **Estimated Receipts** | | |
| AR Collections | $ 394,000 | |
| Other Collections | | |
| Main St. Advances | | |
| **Total Receipts, Cash Inflow** | 394,000 | - |
| **Cost of Goods Sold** | | |
| | Pre Filing | Post Filing |
| | 3 Days | 11 Days |
| **Total Estimated Payroll** | $ 30,882 | $ 113,235 |
| | Pre Filing | Post Filing |
| **Total Payroll Benefits** | $ - | $ - |
| **Total, Fuel** | $ 17,500 | $ - |
| **Total, Other COGS** | $ 32,700 | $ - |
| **Estimated COGS, Total** | $ 194,317 | < Incl. Payroll pre |
| **Net Receipts less Paid COGS** | $ 199,683 | + post |
| *F'cast COGS Margin* | 50.7% | |
| **Total Indirect Costs** | $ 28,700 | $ - |
| **Total, Operations Overhead** | $ 26,690 | $ - |
| **Other Expenses** | | |
| Prof, Legal | | |
| Actng, Third Party | $ 8,500 | |
| Prof, Consulting | | |
| Prof, Other | | |
| Bank Fees | $ 2,500 | |
| Main Street | | |
| Tax, Franchise | | |
| Tax, Property | | |
| Tax, Sales | $ 15,000 | |
| Leasehold improvements | | |
| **Total, Other Expenses** | $ 26,000 | $ - |
| **Cash Outflow** | $ 275,707 | |
| **Operations Cash Flow** | $ 118,293 | |
| **Cummulative Opns Cash Flow** | $ 118,293 | |
| **Interco Trf In (Out), Main** | | |
| **Bank Balance after Opns CF** | $ 274,372 | |

## Exhibit B

| Cash Flow, Rocaceia | October 1 - 15 | | October 16 - 30 | | October-14 | | November-14 | | December-14 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Exhibit A | | Exhibit B > | | Combined | | | | | |
| | Plan | Plan | Plan | | Plan | Actual | Plan | Actual | Plan | Actual |
| **Total Estimated Billings** | | | $ 721,500 | $ - | $ 284,000 | $ - | $ 721,500 | $ - | $ 721,500 | $ - |
| **Estimated Receipts** | | | | | | | | | | |
| AR Collections | $ 394,000 | | $ 393,943 | | $ 787,943 | | $ 744,011 | | $ 659,309 | |
| Other Collections | | | $ 200,000 | | $ 200,000 | | | | | |
| Main St. Advances | | | | | | | | | | |
| **Total Receipts, Cash Inflow** | 394,000 | - | 593,943 | - | 987,943 | - | 744,011 | - | 659,309 | - |
| **Cost of Goods Sold** | | | | | | | | | | |
| | Pre Filing | Post Filing | | | | | | | | |
| | 3 Days | 11 Days | 2 weeks | | 4 weeks | | 4 weeks | | 5 weeks | |
| **Total Estimated Payroll** | $ 30,882 | $ 113,235 | $ 144,117 | | $ 288,234 | | $ 309,664 | | $ 360,292 | |
| | Pre Filing | Post Filing | | | | | | | | |
| **Total Payroll Benefits** | $ - | $ - | $ 46,500 | $ - | $ 46,500 | $ - | $ 46,500 | $ - | $ 46,500 | $ - |
| **Total, Fuel** | $ 17,500 | $ - | $ 53,500 | $ - | $ 71,000 | $ - | $ 71,000 | $ - | $ 81,000 | $ - |
| **Total, Other COGS** | $ 32,700 | $ - | $ 42,350 | $ - | $ 75,050 | $ - | $ 75,050 | $ - | $ 75,050 | $ - |
| **Estimated COGS, Total** | $ 194,317 | < Incl. Payroll pre | $ 286,467 | $ - | $ 480,784 | $ - | $ 502,214 | $ - | $ 562,842 | $ - |
| **Net Receipts less Paid COGS** | $ 199,683 | + post | $ 307,477 | $ - | $ 507,160 | $ - | $ 241,797 | $ - | $ 96,467 | $ - |
| *F'cast COGS Margin* | 50.7% | | 51.8% | #DIV/0! | 51.3% | #DIV/0! | 32.5% | #DIV/0! | 14.6% | #DIV/0! |
| **Total Indirect Costs** | $ 28,700 | $ - | $ 22,800 | $ - | $ 51,500 | $ - | $ 51,500 | $ - | $ 51,500 | $ - |
| **Total, Operations Overhead** | $ 26,690 | $ - | $ 104,665 | $ - | $ 131,355 | $ - | $ 72,355 | $ - | $ 72,355 | $ - |
| **Other Expenses** | | | | | | | | | | |
| Prof, Legal | | | $ - | | $ - | | | | | |
| Actng, Third Party | $ 8,500 | | $ 8,500 | | $ 17,000 | | $ 17,000 | | $ 17,000 | |
| Prof, Consulting | | | | | $ - | | | | | |
| Prof, Other | | | | | $ - | | | | | |
| Bank Fees | $ 2,500 | | $ - | | $ 2,500 | | $ 2,500 | | $ 2,500 | |
| Main Street | | | | | $ - | | | | | |
| Tax, Franchise | | | $ - | | $ - | | $ - | | $ - | |
| Tax, Property | | | | | $ - | | | | | |
| Tax, Sales | $ 15,000 | | $ - | | $ 15,000 | | $ 15,000 | | $ 15,000 | |
| Leasehold improvements | | | | | $ - | | | | | |
| **Total, Other Expenses** | $ 26,000 | $ - | $ 8,500 | $ - | $ 34,500 | $ - | $ 34,500 | $ - | $ 34,500 | $ - |
| **Cash Outflow** | $ 275,707 | | $ 422,432 | | $ 698,139 | $ - | $ 660,569 | | $ 721,197 | |
| **Operations Cash Flow** | $ 118,293 | | $ 171,512 | $ - | $ 289,805 | $ - | $ 83,442 | $ - | $ (61,888) | $ - |
| **Cummulative Opns Cash Flow** | $ 118,293 | | $ 289,805 | $ - | $ 289,805 | $ - | $ 373,247 | $ - | $ 311,359 | $ - |
| **Interco Trf In (Out), Main** | | | | | | | | | | |
| **Bank Balance after Opns CF** | $ 274,372 | | $ 445,884 | | $ 445,884 | | $ 529,326 | | $ 467,438 | |